UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

```
_____
UNITED STATES OF AMERICA      )
                              )
v.                            )   Cr. No. 23-cr-10216-DJC
                              )
JERMALL ANDERSON              )
     Defendant.               )
_____  )
```

**Defendant Anderson's Sentencing Memorandum**

The Defendant Jermall1 Anderson submits this sentencing memorandum in support of his request for a fifteen-year sentence.

**Procedural Background**

On June 11, 2024, Mr. Anderson was charged in a superseding indictment with seven counts of sex trafficking by force, fraud, or coercion in violation of 18 U.S.C. § 1591, one count of transportation across state lines for the purposes of prostitution, in violation of 18 U.S.C. § 2421, and one count of coercion and enticement, in violation of 18 U.S.C. § 2422. On November 12, 2024, the Defendant pled guilty to all counts. In an agreement pursuant to Fed. R. Crim. P. 11(c)(1)(C), the parties agreed to jointly recommend a sentence of 180 months imprisonment followed by five years of supervised release and mandatory restitution.

**Mr. Anderson's History and Characteristics**

The people who know Mr. Anderson say he is a kind, caring, devoted person and parent who has showed tremendous growth and dedication to his community over the years. It is clear based on his recent behavior (both prior to his arrest and

1

after) and the words of his loved ones that Mr. Anderson takes responsibility for his actions and approaches his life with compassion and resilience.

As Anderson's stepdaughter, Ariah, emphasizes in her letter of support, "[Jermall] has taken full responsibility for the charges" and "wants to put this past him and make amends to become the person he wants to be for his family." Ex. 1. Others in Mr. Anderson's life describe Mr. Anderson as someone with great "integrity, compassion, and resilience," who has "exceptional character" and who is committed to "empathy and support." Ex. 8. Simmie Anderson, with whom Mr. Anderson worked closely with at Shoe City Basketball, describes Jermall as a "good-natured person who likes helping others." Ex. 9. Overall, it is clear that Mr. Anderson possesses incredible perseverance. Ex. 2. As the mother of one of his children and his best friend for many years stated in her letter of support, Mr. Anderson's "flaws are no different than anyone else's. His heart isn't any less pure than anyone else's. His commitment to his family isn't any different than anyone else's." Ex. 2.

As part of his desire to help others, Mr. Anderson has engaged extensively in his community. Mr. Anderson "loves giving back to [the] community," is "strongly dedicated to it," and will do "what[ever] he can" to do his best for it. Ex. 4, Ex. 6, Ex. 8. Such engagement has helped Mr. Anderson change his life for the better while improving the lives of others. Mr. Anderson's service to his community has involved various ventures, including volunteering his time at senior living facilities, juvenile

justice programs, outreach counseling, Stop the Violence campaigns, and various youth sports leagues. Ex. 9, Ex. 7.

Specifically, from 2019 to 2020, Mr. Anderson coached Amateur Athletic Union Basketball, and in 2021 he volunteered with Lynn Stop the Violence. PSR at ¶174. He later became a coach with Pop Warner Youth Football and began volunteering with the Salvation Army. *Id*. Mr. Anderson finds tremendous value in this work, and aims to "spread the lessons he's learned in life back to his community through teaching and working with 'troubled youth'." Ex. 3. Mr. Anderson has expanded this community work from purely extracurricular into his working life as well. As a substitute teacher in the Lowell school district, Mr. Anderson focused on "giving back" to his students and helping "guide the youth of today." Ex. 7.

The program director at Wyatt Detention Facility even took note of Mr. Anderson's commitment to the wellbeing of his community, stating in her support letter that "Jermall does well in an environment where he feels he is making a difference." Ex. 11. Records from Wyatt also reveal that Mr. Anderson stayed out of trouble while he was there, was employed as a pod runner with excellent evaluations, and participated in numerous programs. See PSR at ¶7.

As much as Mr. Anderson spends his time and energy giving back to his community, he channels even more focus into his family. Mr. Anderson shows care and support for all of his children. Regardless of whether they are biologically related to him or not, he is a father figure through and through. Ex. 7.

Even Mr. Anderson's supporters who are not part of his immediate family express how prevalent his care for his family is. For example, Ariyanna, Mr. Anderson's niece, expressed in her remarks how impressed she is continually by Mr. Anderson's "unwavering dedication to supporting his family." Ex. 8. This devotion to family was also noted by people who have worked with Mr. Anderson in more formal capacities like volunteering and church. Amy Looney, the programs director at the YMCA where Mr. Anderson volunteered noted in her support letter that she had "never met his family, but he talks about his son all the time; how proud he is of him and how he wants to do good by him." Ex. 10. Similarly, Mr. Anderson's pastor noted in her support letter that "Jermall is deeply connected with his family and overtime has become the glue that keeps them reminded of the value of a close-knit family." Ex. 12.

As his stepdaughter, Ariah Mae, describes in her letter of support, their relationship has always been "very positive," since the day she met him when she was six years old. Ex. 1. Now 14, she confidently says that Mr. Anderson has always showed her "kindness, love, and care." Ex. 1. Similarly, Mr. Anderson's son, Devante, describes his father as being a "central figure" in his life. Ex. 4. Devante identifies his father as his "biggest supporter" and speaks to the fact that Mr. Anderson has been an ever-present and encouraging force for Devante to pursue his dreams and push through challenges. Ex. 4. Mr. Anderson, he says, has always encouraged his children to make the right choices, and has emphasized the importance of hard work and respect. Ex. 4.

Two of Mr. Anderson's older children emphasized in their letters of support that he is a huge "motivating factor" or "motivator" in their lives. Ex. 1, Ex. 4. They cite his encouragements to stay in school, find a passion, get involved in the community, and stay out of trouble. *Id.* Jessica Lemere and Erin Lindsey, both of whom share children with Mr. Anderson, echoed the sentiment of Anderson's older children, emphasizing his "committed" and "positive" presence both in the lives of the mothers and the children. Ex. 2, Ex. 3. Even after his arrest, Mr. Anderson has stayed in close contact with his children, who "have always been his number one priority." Ex. 2, Ex. 3. His prioritization of his children can be seen through Mr. Anderson's frequent communication with all of his children and his involvement in their extracurricular activities, as well as his financial contributions to his children without court-mandated child support. Ex. 5, PSR at ¶160. These interactions with his children make clear his "love, dedication, and compassion." *Id.*

Mr. Anderson's son Devante concluded his letter of support by saying that Jermall is "more than just my father, he is my mentor, my role model, and my biggest source of motivation," which is emblematic of Mr. Anderson's overall approach to his family and children. Ex. 4. Missing out on his children's lives is "all [Mr. Anderson] worries about," and has by far been the most difficult part of his imprisonment. PSR at ¶161.

Those closest to Mr. Anderson have also noted the significant positive changes they have seen him go through in recent years. Such changes include an overall maturing and realignment of his goals, but also "turning his life around."

5

Ex. 2, Ex. 11, Ex. 10. Mr. Anderson has overcome the many challenges thrown at him by his tough upbringing (separation of his family, unstable parenting, financial struggles), and it is clear to his loved ones that he wants to "learn from past mistakes" and "grow from every experience." Ex. 5, Ex. 8. Mr. Anderson's pastor even notes that as she has watched Mr. Anderson mature "from childhood to adulthood," she was able to watch "how he mastered each milestone in life" and is confident in his ability to continue doing so. Ex. 11.

     Several of those close to Mr. Anderson have also expressed that he has a bright future. Mr. Anderson's involvement in his community has led him to counseling as a potential career path. Mr. Anderson even applied and got accepted into North Shore Community College to explore this passion in the Child/Youth Advocacy program prior to his arrest. Ex. 1, PSR at ¶172. Mr. Anderson hopes that in his future he will be able to continue to work in the community, using "his own life experiences to teach those kids that they can do better and show them there is a better life for them if they make the right choices." Ex. 10. Mr. Anderson will continue to apply himself, help his community, and explore his passions in the coming years. As his stepdaughter Ariah stated in her letter of support, she, and Mr. Anderson, are hopeful that when he comes home, he will "start a truly honest life." Ex. 1.

**Argument**

I. **This Court should sentence Mr. Anderson to fifteen years in prison.**

The Court should sentence Mr. Anderson to fifteen years in prison, or 180 months. The primary directive in 18 U.S.C. § 3553(a) is for judges to impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in the statute.[1] The requested sentence would serve these statutory purposes.

The U.S. Supreme Court has highlighted Congress's directive that: "[n]o limitation … be placed on the information concerning the background, character, and conduct of a defendant that a district court may receive and consider for the purpose of imposing an appropriate sentence." *United States v. Pepper*, 562 U.S. 476, 490-491 (2011), citing 18 U.S.C. § 3661. Thus, the Guidelines are simply a starting point from which the district court then has the discretion to "conduct an inquiry broad in scope, largely unlimited either as to the kind of information [it] may consider, or the source from which it may come." *Pepper*, 562 U.S. at 489-90.

Courts often arrive at the conclusion that serious criminal conduct (which this undoubtedly is) requires lengthy prison terms to effectively "punish" or "teach someone a lesson." However, when more effective solutions are available – or when

---

[1] Those factors include:
    (1) the nature and circumstances of the offense and the history and characteristics of the defendant;
    (2) the need for the sentence imposed--
        (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
        (B) to afford adequate deterrence to criminal conduct;
        (C) to protect the public from further crimes of the defendant; and
        (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

those lessons are already being achieved by other means – prison is counterproductive for both the offender and society. In this case, sentencing Mr. Anderson to 180 months is sufficient to satisfy the requirements of § 3553.

### A. A sentence of fifteen years would provide both general and specific deterrence.

The requested sentence would have an "adequate" deterrent effect on the general public. See 18 U.S.C. § 3553. Research consistently indicates that although the certainty of being caught and punished does have a deterrent effect, "increases in severity of punishments do not yield significant (if any) marginal deterrent effects." Michael Tonry, *Purposes and Functions of Sentencing*, 34 Crime & Just. 1, 28 (2006). "Three national academy of science panels…reached that conclusion, as has every major survey of the evidence." *Id*; *see also* Zvi D. Gabbay, *Exploring the Limits of the Restorative Justice Paradigm: Restorative Justice and White Collar Crime*, 8 Cardozo J. Conflict Resol. 481, 447-48 (2007) ("[c]ertainty of punishment is empirically known to be a far better deterrent than its severity."); Steven N. Durlauf & Daniel s. Nagin, *Imprisonment and Crime: Can Both be Reduced?*, 10 Criminology & Pub. Pol'y, 37 (2011)[2] ("The key empirical conclusions of our literature review are that at prevailing levels of certainty and severity, relatively little reliable evidence of variation in the severity of punishment having a substantial deterrent effect is available and that relatively strong evidence indicates that variation in the certainty of punishment has a large deterrent effect, particularly from the vantage point of specific programs that alter the use of

---

[2]Available at http://onlinelibrary.wiley.com/doi/10.1111/j.1745-9133.2010.00680.x/pdf.

police."); Raymond Pasternoster, *How Much do we Really Know About Criminal Deterrence*, 100 J. Crim. L. & Criminology 765, 818 (2010) (there is "no real evidence of a deterrent effect for severity...[i]n virtually every deterrence study to date, the perceived certainty of punishment was more important than the perceived severity." *Id*. At 817.)

Typical of the findings on general deterrence are those of the Institute of Criminology at Cambridge University. *See* Andrew von Hirsch et al., *Criminal Deterrence and Sentence Severity: An Analysis of Recent Research* (1999).[3] The report, commissioned by the British home office, examined penalties in the United States as well as several European countries. *Id*. at 1. It examined the effects of changes to both the certainty and severity of punishment. *Id*. While significant correlations were found between the certainty of punishment and crime rates, the "correlations between sentence severity and crime rates…were not sufficient to achieve statistical significance." *Id*. at 2. The report concluded that, "the studies reviewed do not provide a basis for inferring that increasing the severity of sentences is capable of enhancing deterrent effects." *Id*. at 1.

The requested sentence is sufficient to achieve general deterrence. This sentence is severe enough to send a message to the public that sex trafficking will not be tolerated. A sentence which is any longer would not have any additional general deterrent effect.

---

[3] Summary available at http://members.lycos.co.uk/lawnet/SENTENCE.PDF.

It would also serve as a specific deterrence. Similar to the general deterrence argument above, there is significant research to suggest that while certainty of punishment provides a specific deterrent effect, long prison sentences are not an effective method for combating recidivism. In some circumstances, a longer sentence can have the perverse consequence of *increasing* the likelihood of re-offense, by undercutting the defendant's social connections to family, community, and employers. *See* Valerie Wright, Sentencing Project, *Deterrence in Criminal Justice: Evaluating Certainty vs. Severity of Punishment* 7 (2010) ("…when prison sentences are relatively short, offenders are more likely to maintain their ties to family, employers, and their community, all of which promote successful reentry into society…Conversely, when prisoners serve longer sentences they are more likely to become institutionalized, lose pro-social contacts in the community, and become removed from legitimate opportunities, all of which promote recidivism.")[4]; *see also* Roger Warren, National Center For State Courts, *Evidence-Based Practice To Reduce Recidivism: Implications For State Judiciaries* (2007)("the research evidence is unequivocal that incarceration does not reduce offender recidivism… Incarceration actually results in slightly increased rates of offender recidivism.")[5].

Here, the requested sentence would be the most effective specific deterrent because it would give Mr. Anderson the chance to maintain his community support while he is in custody. A longer prison sentence would be counterproductive to these goals and could result in his isolation upon release.

---

[4]Available at http://www.sentencingproject.org/ doc/Deterrence%20Briefing%20.pdf.
[5]Available at http://nicic.gov/library/files/023358.pdf.

### B. Sentencing Mr. Anderson to 180 months would accomplish the sentencing goals of incapacitation and rehabilitation.

The requested sentence would accomplish the other goals of sentencing. For example, incapacitation deprives defendants of the opportunity to commit crimes by physically detaining them in prison. A sentence of fifteen years would ensure that Mr. Anderson is unable to commit crimes for a significant period of time, as he will be in prison until he is in his late 50s.

Multiple studies have shown that age and criminal history category (CHC) are the two strongest predictors of recidivism, especially when considered together. U.S. Sentencing Comm'n, *Recidivism of Federal Violent Offenders Released in 2010*, at 26, 31 (2022).[6] The likelihood of recidivism decreases steadily as offenders age. *Id.* at 6.[7] Lower criminal history scores are also associated with lower recidivism rates. *Id.* at 28.[8]

When considered separately, Mr. Anderson's age and criminal history strongly support the conclusion that he does not present a high risk of recidivism. However, when considered together, the effect of these two factors is even more significant. *Id.* at 31. Older offenders have lower rates of recidivism compared to younger offenders within each CHC, and recidivism generally decreases within each age category as CHC decreases. *Id.*

---

[6] This report is the fifth in a series continuing the USSC's study of recidivism rates in federal offenders released in 2010. The cited findings in this report are consistent with the four prior USSC reports.
[7] This is consistent with prior USSC Research. *See, e.g.*, U.S. Sentencing Comm'n, *The Effects of Aging on Recidivism Among Federal Offenders*, at 3 (2017).
[8] This is consistent with prior USSC Research. *See*, U.S. Sentencing Comm'n, *The Past Predicts the Future: Criminal History and Recidivism of Federal Offenders*, at 6 (2017).

In one study of federal offenders released in 2005, 30.1% of offenders aged 50 to 59 years with a criminal history category of II were rearrested, compared to 64.0% of those who had a criminal history category of VI. U.S. Sentencing Comm'n, *The Effects of Aging on Recidivism Among Federal Offenders*, at 25 (2017). Mr. Anderson is a 45-year-old man in CHC II who will be nearly 60 when he is released, and is therefore statistically less likely to reoffend than many others who are before the Court. This data supports Mr. Anderson's requested sentence.

### C. The requested sentence would best serve the need to provide restitution.

The requested sentence would allow Mr. Anderson to be released at a time when he still might be able to earn an income and pay restitution. Formerly incarcerated people earn "a fraction of what similar people without a history of incarceration take home."[9] Formerly incarcerated people also have high rates of joblessness after release from prison. In a study conducted by the U.S. Department of Justice, one-third of people released from prison did not find employment at any time in the four years after their release.[10] Sentencing Mr. Anderson to a lengthier incarceration would likely result in limited or perhaps zero future job prospects, thereby reducing his ability to pay restitution, as he would be beyond the age where he would be able to work or where he is likely to be hired for work.

---

[9] Andrew Garin, et al., *The Impact of Incarceration on Employment, Earnings, and Tax Filing*, The University of Chicago Becker Friedman Institute for Economics, Aug. 9, 2023, https://bfi.uchicago.edu/insight/research-summary/the-impact-of-incarceration-on-employment-earnings-and-tax-filing/.

[10] Bureau of Justice Statistics, *Employment of Persons Released from Federal Prison in 2010, Special Report*, U.S. Department of Justice, December 2021, https://bjs.ojp.gov/content/pub/pdf/eprfp10.pdf.

## Conclusion

Mr. Anderson respectfully requests a sentence of 180 months, which is "sufficient, but not greater than necessary" to comply with 18 U.S.C. § 3353(a)(2).

Respectfully submitted,
Jermall Anderson
By his attorney

/s/ Michael Tumposky
Michael Tumposky
BBO No. 660618
Tumposky and Associates P.C.
88 Broad Street, Suite 101
Boston, MA 02110
T) (617) 722-8220
F) (617) 507-8116
E) Tumposky@TumposkyLaw.com

## Certificate of Service

I, Michael Tumposky, hereby certify that on this the 7th day of March, 2025, I served one true and correct copy of this document on all counsel of record.

/s/ Michael Tumposky
Michael Tumposky